IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

Pamela Jean Watkins

No. 4:11-CV-673-JMM

Michael J. Astrue, Commissioner,                                                    Defendant
Social Security Administration

ORDER AFFIRMING THE COMMISSIONER'S DECISION

In this case, plaintiff-claimant Pamela Jean Watkins sought judicial review of

defendant Commissioner Michael J. Astrue's denial of her application for disability

income benefits (DIB).  Watkins asked the court to reverse the Commissioner's decision

and remand her case to the Social Security Administration (SSA) for the award of

benefits.[1]  In the alternative, she asked the court to remand this case for further

proceedings.  After considering the record, the arguments of the parties, and the

applicable law, this court affirms the Commissioner's decision.

**Scope of judicial review**.  In reviewing a decision denying an application for

disability benefits, the court must determine whether substantial evidence supports the

Commissioner's decision and whether the Commissioner made a legal error.[2]

_____

[1]Docket entry # 1.

[2]*See* 42 U.S.C. § 405(g) (requiring the district court to determine whether the
Commissioner's findings are supported by substantial evidence and whether the
Commissioner conformed with applicable regulations); *Slusser v. Astrue*, 557 F.3d 923,
925 (8th Cir. 2009) (stating that the court's "review of the Commissioner's denial of
benefits is limited to whether the decision is 'supported by substantial evidence in the

Substantial evidence is more than a mere scintilla of evidence; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[3]  In determining whether substantial evidence supports the Commissioner's decision, the court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports the decision, but the court may not reverse the Commissioner's decision simply because substantial evidence supports a contrary decision.[4]

**The disputed issues**.  The parties do not dispute that Watkins exhausted her administrative remedies[5] or that the Commissioner's administrative law judge (ALJ) followed the required five-step process for determining whether a DIB claimant is disabled.[6]  Instead, the parties disagree about the following aspects of the Commissioner's decision:

---

record as a whole'"); *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) ("We will uphold the Commissioner's decision to deny an applicant disability benefits if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled.").

[3]*See Slusser*, 557 F.3d at 925.

[4]*See Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

[5]*See Anderson v. Sullivan*, 959 F.2d 690, 692 (8th Cir. 1992) (stating that "the Social Security Act precludes general federal subject matter jurisdiction until administrative remedies have been exhausted" and explaining that the Commissioner's appeal procedure permits claimants to appeal only final decisions).

[6]*See* 20 C.F.R. § 404.1520 (setting forth the five-step sequential evaluation process used for determining whether a claimant is disabled and entitled to disability benefits).

(1) the ALJ's evaluation of Watkins's credibility,

(2) the weight given to an examining physician's opinion, and,

(3) the Commissioner's consideration of new evidence.

Disputing these matters, Watkins argued that substantial evidence does not support the Commissioner's conclusion that she was not disabled.  Watkins also maintained the Commissioner's decision does not comport with required legal standards.

**The Commissioner's decision**.  Before applying for disability benefits, Watkins worked on the assembly line for the IC Corporation bus plant[7] in Conway, Arkansas. Watkins operated a large, ceiling-suspended drill, drilling holes in bus window frames and engine covers, and riveting windows into place.[8]  Watkins worked at the plant for 15 years.[9]  She lost her job on January 4, 2010, when the plant closed and bus-assembly operations moved to Tulsa, Oklahoma.[10]

The following month, Watkins applied for DIB[11] and based disability on

---

[7]SSA record at pp. 44, 160 & 166.

[8]*Id*. at pp. 45 & 166.

[9]*Id*. at p. 176.

[10]Watkins initially based her on-set date on the date the plant closed, but she amended the date at her hearing to coincide with her last work day in 2009, Dec. 31, 2009.  *Id*. at p, 44.

[11]*Id*. at p. 125.

3

rheumatoid arthritis, osteoarthritis and depression.[12]  Watkins complained about headaches, depression, and pain in her arms, neck, and lower back.  She reported getting up every couple of hours at night because of pain.[13]  Watkins testified that she lacked grip strength in her right hand and that she could not straighten out the right hand.[14]  Although the bus plant closed, Watkins reported that she stopped working because of her medical condition.[15]

After considering Watkins's application, the ALJ determined that despite having severe impairments—rheumatoid arthritis and a mood disorder[16]—Watkins had the residual functional capacity (RFC)[17] to perform to perform light work, except that she could only occasionally climb, balance, crawl, kneel, stoop, crouch, and work overhead.[18]  The ALJ determined that Watkins must do work in which interpersonal contact is incidental to the work performed, the complexity of the tasks is learned and

---

[12]*Id*. at p. 158.

[13]*Id*. at p. 190.

[14]*Id*. at p. 49.

[15]*Id*. at p. 158.

[16]*Id*. at p. 15.

[17]The Commissioner's regulations define RFC as "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

[18]SSA record at p. 17.

performed by rote with few variables and little judgment involved, and the supervision

is simple, direct, and concrete.[19]  The ALJ consulted a vocational expert and determined

that there were jobs in the national economy that Watkins could perform.  The ALJ

concluded that Watkins was not disabled under the Social Security Act.[20]  The ALJ's

decision became the final decision of the Commissioner for the purpose of judicial

review pursuant to 42 U.S.C. § 405(g).

   **Substantial evidence supports the Commissioner's decision**.  The following

substantial evidence supports the Commissioner's conclusion that Watkins was not

disabled: (1) evidence about arthritis, (2) evidence about depression, and (3) vocational

expert testimony.

   <u>Evidence about arthritis</u>.  On November 13, 2009, Watkins's primary care

physician diagnosed Watkins as having polyarticular arthritis.[21]  Polyarticular arthritis

is a form of rheumatoid arthritis that causes pain and swelling in five or more joints.[22]

---

[19]*Id*.

[20]*Id*. at p. 21.  To be disabled under the Social Security Act, a claimant must be
"unable to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous period of not less
than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

[21]SSA record at p. 307.

[22]4-14B Courtoom Med. - Pain & Suffering § 14B.03 (explaining that polyarticular
arthritis involves five or more joints; the disease is characterized by joint swelling,

Rheumatoid arthritis primarily affects the joints, but the disease can cause problems throughout the body like inflammation of the blood vessels, bumps in various parts of the body, lung disease, blood disorders and weakening of the bones.[23]  The diagnosis of polyarticular arthritis supports the ALJ's determination that rheumatoid arthritis is a severe impairment because, in the later stages of the disease, "inflamed cells release substances that start destroying bone and cartilage, causing joint deformity, more pain, and loss of function."[24]

Treatment of rheumatoid arthritis focuses on combating inflammation with anti-rheumatic drugs and exercising to maintain flexibility and mobility.[25]  Watkins's doctor prescribed anti-inflammatory drugs[26] and encouraged Watkins to exercise.[27]  After

---

stiffness and pain").

[23]5 The Gale Encyclopedia of Med. 3787 & 3789 (4th ed.).

[24]*Id*. at 3787.  *See* Mikel A. Rothenberg, MD, Preparing Orthopedic Disability Cases § 1.09 (characterizing rheumatoid arthritis as "a severe and progressive disease of the joints that results in a diminished quality of life and in a decreased life expectancy"); Stedman's Med. Dictionary 160 (28th ed.) (defining rheumatoid arthritis as "a generalized disease…which primarily affects connective tissue; arthritis is the dominant clinical manifestation, involving many joints, especially those of the hands and feet, accompanied by thickening of articular soft tissue, with extension of synovial tissue over articular cartilages, which become eroded; the course is variable but often is chronic and progressive, leading to deformities and disability").

[25]5 The Gale Encyclopedia of Med. 3790 (4th ed.).

[26]SSA record at pp. 307 & 377.

[27]*Id*. at pp. 308 & 379.

Watkins continued to complain about pain, her doctor prescribed physical therapy.[28]

The doctor's treatment notes support the ALJ's RFC assessment because the notes

documented no complications—no inflammation of the blood vessels, bumps in various

parts of the body, lung disease, blood disorders or weakening of the bones.

A state agency orthopaedist examined Watkins a few months after her doctor

referred her to a physical therapist.  The examining orthopaedist observed that Watkins

walked with a slight limp on the right leg.[29]  The doctor reported that Watkins had a

complete range of motion in the lumbar spine with minimal pain, no acute muscle

spasms, normal reflex and sensation, negative straight leg raises, and no muscle

atrophy.[30]  The doctor found evidence of arthritis in both hands and all finger joints, but

reported that Watkins could still grip her hand, even though the grip was weak.[31]  The

doctor found a complete range of motion in the hands, no acute swelling in the knees,

good range of motion in the knees, painful range of motion in right hip, and a complete

range of motion in both shoulders with no pain.[32]  An Xray of right shoulder was

---

[28]*Id*. at p. 376.

[29]*Id*. at p. 324.

[30]*Id*. at p. 325.

[31]*Id*.

[32]*Id*.

normal.[33]  An Xray of right hip was normal and showed well-maintained joint spacing.[34]

An Xray of right knee was normal.[35]  The examiner reported that the disease was "still

under control with medications."[36]  The examiner's findings support the ALJ's

determination that Watkins could do light work, albeit with pain, because the findings

show that Watkins's disease had not progressed in a degree that severely interfered

with joint movement.[37]

A state medical consultant reviewed Watkins's medical records and the

orthopaedist's report, and opined that Watkins could do light work, with occasional

climbing, balancing, stooping, kneeling, crouching and/or crawling.[38]  That opinion

supports the Commissioner's decision because the opinion served as the basis of the

RFC assessment.

Evidence about depression.  Nine months after diagnosing polyarticular arthritis,

---

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.*

[37]5 The Gale Encyclopedia of Med. 3787 (4th ed.) (explaining that in later stages of the disease, the bone, articular surfaces of the bones, and ligaments may begin to erode, severely interfering with movements of the joints).

[38]SSA record at p. 331.

Watkins's primary care physician diagnosed Watkins as having depression.[39]

Depression is a mood disorder.[40]  Medical studies have associated depression with

rheumatoid arthritis.[41]  One study explained that "[t]he less mobile and more dependent

patients become, the more depressed they are."[42]  The diagnosis of depression supports

the ALJ's determination that a mood disorder was a severe impairment because

---

[39]*Id*. at p. 379.

[40]Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 317 (4th ed.) (classifying depression as a mood disorder).

[41]*See* Tanya Covic, Steven R. Cumming, Julie F. Pallant, Nick Manolios, Paul Emery, Philip G. Conaghan & Alan Tennant, *Depression & Anxiety in Patients with Rheumatoid Arthritis: Prevalence rates based on a comparison of the Depression, Anxiety & Stress Scale (DASS) & the Hospital, Anxiety & Depression Scale (HADS)*, 12 BMC Psychiatry 6 (2012) (reporting that depression affects between 13% and 20% of people with rheumatoid arthritis); Mary Margaretten, Laura Julian, Patricia Katz & Edward Yelin, *Depression in patients with rheumatoid arthritis: description, causes & mechanisms*, 6 Int'l J. Clinical Rheumatology 617 (2011) (stating that 13% to 42% of patients with rheumatoid arthritis have major depressive disorder—at least two to four times more than the general population); Chris Dickens, PhD, Linda McGowan, PhD, David Clark-Carter, PhD & Francis Creed, MD, *Depression in Rheumatoid Arthritis: A Systematic Review of the Literature With Meta—Analysis*, 64 Psychosomatic Med. (Jan./Feb. 2002), at 52, 52 & 58 (stating that depressive disorder affects between 13% and 17% of patients with rheumatoid arthritis and reporting that the extent depression flows from pain is unclear); Ernest T. Robinson, Luis A. Hernandez, W. Carson Dick & W. Watson Buchanan, *Depression in rheumatoid arthritis*, J. of the Royal College of Gen. Practitioners 423, 426 (July 1977) (reporting that a medical study showed a significant correlation between the articular index of joint tenderness, functional impairment and dependence on others, but not between pain and depression).

[42]Ernest T. Robinson, Luis A. Hernandez, W. Carson Dick & W. Watson Buchanan, *Depression in rheumatoid arthritis*, J. of the Royal College of Gen. Practitioners 423, 427 (July 1977).

depression in rheumatoid arthritis has been "associated with higher levels of disease activity, pain, fatigue, work disability, health service use but lower treatment compliance and increased suicide risk and mortality."[43]

Untreated major depression can impair a person's ability to work,[44] but Watkins's doctor prescribed no treatment for depression.  Watkins reported to a state examining psychologist that she took Zoloft—a psychotropic drug—following the death of her mother in 2004, and again in 2007,[45] but medical records did not confirm that report.  The lack of treatment indicates Watkins exhibited minor symptoms that did not prevent her from working.  When asked whether Watkins could cope with the typical mental/cognitive demands of basic work-like tasks, the examining psychologist responded, "the claimant can cope with the mental demands of basic work tasks.  She

---

[43]Tanya Covic, Steven R. Cumming, Julie F. Pallant, Nick Manolios, Paul Emery, Philip G. Conaghan & Alan Tennant, *Depression & Anxiety in Patients with Rheumatoid Arthritis: Prevalence rates based on a comparison of the Depression, Anxiety & Stress Scale (DASS) & the Hospital, Anxiety and Depression Scale (HADS)*, 12 BMC  Psychiatry 6 (2012). *See* Mary Margaretten, Laura Julian, Patricia Katz & Edward Yelin, *Depression in patients with rheumatoid arthritis: description, causes & mechanisms*, 6 Int'l J. Clinical Rheumatology 617 (2011) (reporting that depression increases the risk of mortality and stating that depression is "an independent risk factor for cardiovascular disease and myocardial infarction, suicidal ideation and death").

[44]2 The Gale Encyclopedia of Med. 1324-25 (4th ed.).

[45]SSA record at p. 313.

was just working two months ago until her plant closed down."[46]  This response

indicates Watkins could work.

After reveiwing the examining psychologist's report, a state consulting physician

opined that Watkins could do work "where interpersonal contact is routine but

superficial, e.g. grocery checker; complexity of tasks is learned by experience, several

variables, uses judgment with limits; supervision required is little for routine but

detailed for non-routine."[47]  That opinion supports the Commissioner's decision

because the ALJ included those limitations the RFC assessment.

<u>Vocational expert testimony</u>.  The vocational expert testified that a person with

Watkins's RFC could do light, unskilled work.[48]  As representative jobs, the witness

testified that the person could work as a machine tender, motel maid or assembly

worker.[49]  The witness estimated that there are 2,599 light, unskilled machine tender

jobs in Arkansas, and 248,177 nationwide; 3,297 motel maid jobs in Arkansas, and

367,779 nationwide; and 11,184 light, unskilled production and assembly worker jobs in

Arkansas, and 657,969 nationwide.[50]  This testimony supports the ALJ's determination

---

[46]*Id*. at p. 319.

[47]*Id*. at p. 342.

[48]*Id*. at p. 63.

[49]*Id*.

[50]*Id*.

that Watkins could do other work that existed in significant numbers in the national economy because it incorporated limitations flowing from Watkins impairments and because the testified-to numbers are significant.

The foregoing evidence constituted more than a mere scintilla of evidence. A reasonable mind would accept this evidence as adequate to support the conclusion that Watkins was not disabled. For these reasons, the foregoing evidence constitutes substantial evidence.

**The Commissioner's decision comports with applicable legal standards**.

<u>Watkins's credibility</u>. In determining her RFC, the ALJ found Watkins could "frequently finger and handle."[51] Watkins complained that substantial evidence does not support this finding.[52] She maintained that she was limited to only occasional handling and less than sedentary work. She argued that the only evidence contradicting her testimony about her limitations with fingering and handling was that of a non-examining physician.[53] This complaint challenges the ALJ's assessment of Watkins's credibility.

An ALJ has a statutory duty "to assess the credibility of the claimant and other

---

[51]*Id*. at p. 17.

[52]Docket entry # 7, p. 4.

[53]*Id*. at p. 5.

witnesses."[54]  "In assessing a claimant's credibility, an ALJ must consider all of the evidence related to the subjective complaints, the claimant's daily activities, observations of third parties, and the reports of treating and examining physicians."[55] "The ALJ may discount complaints of pain if they are inconsistent with the evidence as a whole."[56]  A reviewing court "will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so."[57]

Watkins testified that she had problems with gripping and that she had no strength in her hands.[58]  She asserted that she could not straighten out her right hand.[59] She stated that her hands cramped when writing[60] and that she couldn't carry a gallon of milk with her left hand.[61]  She stated that some days she cannot button or zip her jeans.[62]  This testimony is important to Watkins's argument because the vocational

---

[54]*Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992).

[55]*McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

[56]*Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).

[57]*Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (citation omitted).

[58]SSA record at p. 49.

[59]*Id.*

[60]*Id.* at p. 50.

[61]*Id.* at p. 52.

[62]*Id.* at p. 53.

expert testified that the occupational base for a person who can only occasionally finger and handle is very limited.[63]

The ALJ discounted Watkins's testimony, stating that, "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the [RFC]…assessment.  Furthermore, the medical evidence does not fully support the limitations alleged."[64]  The ALJ continued to discuss Watkins's allegations about her daily activities, her limitations, and the medical evidence.  The ALJ discussed the examining orthopaedist's finding that Watkins could still make a grip—although a weak grip—and had a full range of motion in her hands.  The ALJ also observed that Watkins stopped working because her employer closed, not because of her medical condition.  These reasons constitute good reasons for discrediting Watkins's testimony about limitations in fingering and handling.

Nothing in the medical records substantiated Watkins's allegations.  Watkins reported that she stopped working because of her medical condition, but she lost her job when the bus plant closed.  After the plant closed, Watkins received unemployment payments.  Watkins reported to the examining orthopaedist that "she and her husband

---

[63]*Id*. at p. 64.

[64]*Id*. at p. 18.

both draw unemployment until they find a job."[65]  Receiving unemployment benefits

required Watkins to certify that she was able to work.[66]  Seeking work after the alleged

on-set date and receiving unemployment benefits undermined Watkins's credibility.[67]

The ALJ did not err in assessing Watkins's credibility.[68]

Weight given to an examining physician's opinion.  The ALJ gave the examining

orthopaedist's opinion "great weight."[69]  Watkins challenged that assessment.  She

complained that the examiner did not consider her employer medical records which

documented 49 clinic visits for right arm pain and 69 visits for left arm pain.[70]

Nevertheless, she maintained the examiner's findings supported her allegation of

---

[65]SSA record at p. 325.

[66]See Ark. Code Ann. § 11-10-507(3) (setting eligibility conditions for unemployment benefits and including as a condition that the claimant "is unemployed, is physically and mentally able to perform suitable work, and is available for such work").

[67]Accord Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998) (upholding ALJ's credibility assessment which noted that although claimant's long work history supported her subjective complaints of disabling pain, the claimant stopped working because she was laid off, she sought work after her alleged disability on-set date, and she received unemployment benefits after her alleged disability on-set date).

[68]Accord Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) ("Seeking work and working at a job while applying for benefits, are activities inconsistent with complaints of disabling pain.").

[69]SSA record at p. 20.

[70]Docket entry # 7, p. 11.

disabling pain.[71]

"Generally, if a consulting physician examines a claimant only once, his or her opinion is not considered substantial evidence, especially if the treating physician contradicts the consulting physician's opinion."[72]  In this case, the treating physician did not contradict the examining orthopaedist's opinion.  Instead, the examining orthopaedist opined on an area implicated by Watkins's allegations.

The Commissioner's regulations direct the ALJ to "give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."[73]  Watkins's allegations implicated the musculoskeletal system because Watkins complained about arm, shoulder, leg, hip, and back pain.  An orthopaedist specializes in the musculoskeletal system.[74]  Watkins had never been examined by a orthopaedist.

Rather than base a decision on treatment records alone, the ALJ ordered an

---

[71]*Id*. at p. 8.

[72]*Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004).

[73]20 C.F.R. § 404.1527(d)(5).

[74]Stedman's Med. Dictionary 1383 (28th ed.) (defining an orthopedist as "[o]ne who practices orthopaedics").  *See id*. (defining orthopedics as "[t]he medical specialty concerned with the preservation, restoration, and development of form and function of the musculoskeletal system, extremities, spine, and associated structures by medical, surgical, and physical methods.").

orthopaedic exam to ascertain the scope of Watkins's medical condition.  The examining orthopaedist provided specific findings about Watkins's musculoskeletal system.  In doing so, the ALJ fulfilled the duty to fully and fairly develop the record.[75]  The examining orthopaedist did not need to review Watkins's employer medical records because those records were not relevant to a musculoskeletal examination.   The ALJ properly relied on the orthopaedist's findings in determining whether Watkins was disabled.

Notably, Watkins's treating physician never referred Watkins to specialist.[76]  A referral would have evidenced complications or serious symptoms.  To the extent that Watkins relied on years of physical therapy for her shoulders,[77] the ALJ limited Watkins to light work requiring occasional overhead work.  To the extent Watkins challenged the weight given to the consulting physician's opinion,[78] the consulting physician reviewed Watkins's medical records and the examining orthopaedist's report before

---

[75]*Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) ("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.").

[76]SSA record at p. 377 (stating on Jan. 7, 2011 that "[i]f she is much improved on the prednisone, a rheumatology referral may be in order); p. 376 (writing on Feb. 15, 2011, "Will have her doing some physical therapy for 3 weeks then reevaluate.…If no better after physical therapy, will refer to the orthopedist.").

[77]Docket entry # 7, p. 10.

[78]*Id*. at pp. 8-9.

opining about Watkins's ability to work.  The ALJ did not err.

Consideration of new evidence.  During the hearing, Watkins's attorney indicated she was trying to obtain a MRI report.[79]  The attorney submitted the report to the Appeals Council.  Watkins complained that neither the ALJ nor the Appeals Council considered the MRI report.  Watkins maintained the MRI report constituted "material evidence regarding the objective basis of her allegations of pain and limitation."[80]

"Under [the Commissioner's regulations], if a claimant files additional medical evidence with a request for review prior to the date of the [Commissioner's] final decision, the Appeals Council MUST consider the additional evidence if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision."[81]  The MRI report was new, relevant and related to the period on or before the date of the ALJ's decision because the report documented findings about Watkins's lumbar spine before the ALJ's decision became final.

The record shows the Appeals Council considered the MRI report because the Appeals Council acknowledged receiving the additional evidence, added the additional

---

[79]SSA record at p. 43.

[80]Docket entry # 7, p. 11.

[81]*Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990).

18

evidence to the record, stated that it considered the additional information,[82] reported

that the new evidence did not provide a basis for changing the ALJ's decision,[83] and

referred to the new evidence in an attachment to its order.[84]  By doing so, the Appeals

Council complied with the Commissioner's regulations.[85]

      "Where, as here, the Appeals Council considers new evidence but denies review,

[the real issue is] whether the ALJ's decision was supported by substantial evidence on

the record as a whole, including the new evidence."[86]  The ALJ's decision in this case

was supported by substantial evidence on the record as a whole, including the MRI

report, because the report provided no basis for questioning the ALJ's determination.

      The report provided no basis for questioning the ALJ's decision because it

showed that the nerve roots of the lumbar spine had not been compromised.  The report

---

[82]SSA record at p. 4

[83]*Id*. at pp. 1-2.

[84]*Id*. at p. 4.

[85]*Accord Smith v. Astrue*, No. 5:11-CV-160-JLH, 2012 WL 2232264, at *5 (E.D. Ark. June 15, 2012)(determining that the Appeals Council complied with the Commissioner's regulations where the Appeals Council acknowledged receiving the additional evidence, added the new evidence to the record, stated that it considered the additional information, determined the evidence did not provide a basis for changing the ALJ's decision, and referred to the new evidence in an attachment to its order); *Baker v. Astrue*, No. 5:10-CV-194-SWW, 2011 WL 4434530, at *2 (E.D. Ark. Sept. 23, 2011) (same determination).

[86]*Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

stated, "Degenerative changes are present but no evidence for mechanical nerve root impingement."[87] Nerve root impingement occurs when the structural integrity of a lumbar disc deteriorates. When the nucleus of a disc ruptures and is forced out through the outer annulus into the spaces between the vertebrae, the forced-out material may pressure the nerve roots and surrounding soft tissue, irritating the nerve root and causing inflammation of the nerve and surrounding soft tissues. This is called nerve root impingement. When a nerve root is compromised, a person can experience pain in the lower back and hip that radiates down the back of the thigh, leg numbness, tingling, and weakness.[88] Because the MRI showed no evidence of nerve root impingement, the report undermined Watkins's allegation of loss of function, weakness, and pain.

In actuality, the MRI report contributed little in documenting Watkins's back problems. The report confirmed the presence of degenerative disc changes in lower lumbar discs,[89] but Watkins's treating physician had already determined Watkins had degenerative disc disease.[90] Rather substantiate Watkins's allegation of disabling pain, the report contradicted her allegation. The Commissioner did not err.

---

[87]SSA record at p. 382.

[88]2 The Gale Encyclopedia of Med. 2112 (4th ed.); *id*. at vol 4, p. 2524.

[89]SSA record at p. 382.

[90]*Id*. at pp. 306-09 & 378-79.

**Conclusion**.  Having determined that substantial evidence supports the Commissioner's denial of Watkins's application, and the Commissioner made no legal error, the court DENIES Watkins's request for relief (docket entry # 1) and AFFIRMS the Commissioner's decision.

It is so ordered this 23rd day of August, 2012.


_____
United States District Judge